ALLWASTE ENVIRONMENTAL SER-
VICES/NORTH ATLANTIC, INC.,
f/d/b/a Wes Incorporated, Plaintiff,

v.

Joseph PASTORE and Harold
Siagel, Defendants.

Civil No. 94–42–P–H.

United States District Court,
D. Maine.

Jan. 16, 1996.

**30**

Brett D. Barber, Robert E. Sutcliffe, Rudman & Winchell, Bangor, ME, for plaintiff.

Jeffrey A. Thaler, William D. Robitzek, Berman & Simmons, P.A., Lewiston, ME, for defendant Pastore.

Sheldon I. Berns, Ronald P. Friedberg, Kahn, Kleinman, Yanowitz & Arnson Co., L.P.A., Cleveland, OH, Marshall J. Tinkle, Thompkins Clough Hirshon & Langer, Portland, ME, for defendant Siagel.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT ON LIABILITY

HORNBY, District Judge.

At bottom this is a lawsuit over an indemnity agreement, but it is complicated by the typical corporate restructurings that occur during purchases and sales and by the intricacies of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* Once the transactions are analyzed and the potential scope of CERCLA liability assessed, I conclude on the cross-motions for summary judgment that the defendant Harold Siagel is liable on the indemnity agreement he signed. How much he should pay, however, is a matter that will remain open.

### FACTS

The material facts are not in dispute. WES, Inc. ("WES") purchased some of the assets of National Industries. In connection with the transaction, Siagel, the sole shareholder of National Industries, signed an indemnity agreement running to WES, "its successors and assigns," to protect WES financially from any "threatened litigation or administrative proceeding of whatever kind or description ... arising in the future" attributable to events that had occurred before the sale. Thomas Sawyer was the sole shareholder of WES. He subsequently sold all of his WES stock to Allwaste, Inc. ("Allwaste"), which in turn transferred the stock to its wholly-owned subsidiary Allwaste Environmental Services, Inc. That stock transaction included a provision in which Sawyer agreed to indemnify WES, Allwaste and their successors from any CERCLA liability arising from WES's purchase of National Industries' assets. WES continued as a separate corporate subsidiary of Allwaste and in 1992 merged into another corporation, which became known as Allwaste Environmental Services/North Atlantic, Inc., the plaintiff here. I shall refer to it throughout, however, as WES for simplicity's sake.

In 1987, the Environmental Protection Agency ("EPA") sought payment under CERCLA from some 400 potentially responsible parties ("PRPs") for the costs of cleaning up a Superfund site. WES was one of these. This potential liability derived from the assets that National Industries had sold to WES and concerning which Siagel had

signed the indemnity agreement. WES through its lawyers made at least five written demands on Siagel to honor the indemnity agreement. Siagel refused. In 1988, WES notified Siagel of its intention, and sought his consent, to enter settlement negotiations with the EPA so as to avoid potential joint and several liability for the full costs of the Superfund site clean up. Siagel declined to authorize any settlement, asserting that WES had no liability, and that any settlement would therefore be "entirely voluntary." Siagel, however, offered neither to indemnify nor to defend WES against EPA's demands. WES again sought Siagel's approval of its settlement negotiations in 1991 and on July 26 of that year notified Siagel that his "failure ... to provide a defense and hold the indemnitee harmless necessitates ... entering into the settlement agreement" with the EPA. Siagel replied on August 5, 1991, and, without approving the settlement, stated that "you should use your own judgment about how best to respond." In the meantime, on July 31, 1991, WES entered into a consent decree with the EPA. Because of his own indemnity agreement with WES and Allwaste, Sawyer has provided all the funds required by the EPA settlement through a subchapter S corporation, Sawyer Environmental, Inc., owned entirely by Sawyer.

In this lawsuit, WES seeks to recover from Siagel its Superfund site liabilities based upon Siagel's indemnity agreement. Siagel denies that he is liable and both sides have moved for summary judgment on liability.

### REAL PARTY IN INTEREST

■ Siagel's first argument is that WES cannot bring the lawsuit because it has suffered no loss (Sawyer having paid the EPA) and is therefore not a real party in interest under Fed.R.Civ.P. 17(a). As a result, WES has filed an affidavit by Sawyer individually and on behalf of two subchapter S corporations ratifying WES's actions in bringing the lawsuit, agreeing to be bound by the lawsuit, and waiving any right to pursue subrogation

rights against the defendant Siagel outside of this proceeding.[1] Alternatively, WES and Sawyer seek to have Sawyer and his companies joined as parties to the litigation. Siagel objects, arguing that the attempted ratification or joinder is too late and prejudicial to his defense of the case. I find the ratification sufficient to permit the lawsuit to proceed and find no undue delay or prejudice to Siagel. It is therefore unnecessary to join Sawyer and his companies directly in the action.

■ Fed.R.Civ.P. 17(a) states in part:

No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

The purpose of the rule is to protect a defendant like Siagel "from facing a subsequent similar action brought by one not a party to the present proceeding [such as Sawyer or his companies] and to ensure that any action taken to judgment will have its proper effect as res judicata." *Prevor–Mayorsohn Caribbean,* 620 F.2d 1, 4 (1st Cir.1980); *see also* Notes of Advisory Committee, Fed.R.Civ.P. 17, 1966 Amendment. The determination of whether ratification is appropriate is discretionary. *Motta v. Resource Shipping & Enterprises Co.,* 499 F.Supp. 1365, 1371 (S.D.N.Y.1980).

In the absence of prejudice, there is no reason to prevent the ratification. *See Maddalone v. Okada Shosen, KK,* 756 F.2d 886, 887 (1st Cir.1985); *Marston v. American Employers Ins. Co.,* 439 F.2d 1035, 1041 (1st Cir.1971). I see no prejudice to Siagel in permitting Sawyer's ratification. The basis of any Siagel liability remains the written indemnity agreement to WES. Ratification simply ensures that whatever the outcome of

---

1. Sawyer's affidavit reserves an exception in the event that this court decides that WES "has not incurred a debt or [] is not the real party in interest." This exception does not interfere with

Sawyer's agreement to be bound by the merits of the present lawsuit; it merely preserves his right to appeal a decision denying ratification or joinder.

this lawsuit, Sawyer and his companies have no alternative recourse against Siagel, but must work things out with WES. Siagel speaks generally of his need for discovery to ascertain the viability of defenses he might have against Sawyer. I am not making Sawyer a party, however, but simply permitting his ratification of the WES lawsuit. Siagel also complains that at this point he cannot bring back into the case another individual signer of the indemnity letter who has already settled with WES. I see no prejudice to Siagel there, since whatever arguments Siagel may have can be entertained in determining the amount Siagel is obliged to pay, or in a separate lawsuit. Finally, the ratification is not too late. Although Siagel generally raised WES's lack of standing in his Answer filed September 14, 1994, the details of this argument were fleshed out in the recent summary judgment motion practice. Contrary to Siagel's contentions, the summary judgment record does not demonstrate bad faith by the plaintiff on this issue of who actually made the payments.

Out of an abundance of caution, I will permit Siagel thirty (30) days in which to make a specific showing of any additional discovery he is required to undertake because of my ruling. If the plaintiff has any objection to the requested additional discovery, it shall respond in writing within ten (10) days. Thereafter, the Clerk's Office shall schedule a conference to discuss any discovery disputes.

Because I conclude that ratification is sufficient, there is no need to proceed to joinder. Indeed, the 1966 amendment to Rule 17(a) specifically permits ratification as an option in place of joinder, *see Lister v. Plunk*, 77 F.R.D. 359, 360 (N.D.Miss.1977); 6A Wright & Miller, *Federal Practice and Procedure* § 1555 at 417 (1990), and thus, to the extent that *United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 380–81, 70 S.Ct. 207, 215–16, 94 L.Ed. 171 (1949), suggests that actual joinder as required, it is altered

by the change in the Rule. *See also Prevor–Mayorsohn Caribbean*, 620 F.2d at 3 n. 2.

### ACTUAL OR POTENTIAL LIABILITY

Siagel argues that WES entered into the EPA consent decree as a "volunteer." As a result, Siagel maintains, he should not be responsible under his indemnity agreement. The parties agree that on this question the controlling standard is set forth in *GAB Business Servs., Inc. v. Syndicate 627*, 809 F.2d 755, 760 (11th Cir.1987), and *Parfait v. Jahncke Serv., Inc.*, 484 F.2d 296, 304–05 (5th Cir.1973), *cert. denied*, 415 U.S. 957, 94 S.Ct. 1485, 39 L.Ed.2d 572 (1974). Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ.J. at 12; Def.'s Mem. in Opp'n to Pl.'s Mot. for Partial Summ.J. ("Def.'s Opp'n Mem.") at 15.[2] *Parfait* held that to recover on an indemnity claim, a plaintiff like WES need only demonstrate "potential" rather than actual liability if it has offered the indemnitor (here Siagel) "the choice of (1) approving the settlement or (2) taking over the defense of the case and agreeing to hold the indemnitee harmless in any event for damages which may be assessed ... in excess of the amount of the proposed settlement." 484 F.2d at 305. *GAB Business Servs.* made clear that a plaintiff like WES is not required to make this precise offer, but only to provide " 'substantially the same protection' as if this procedure had been followed." 809 F.2d at 760, quoting *Parfait*, 484 F.2d at 305.

Siagel states in his May 24, 1995, affidavit that "[p]rior to entering into the consent decree with the EPA, [WES] never gave me the choice of either approving the consent decree or of taking over [WES's] defense in the EPA action." He does not dispute WES's assertions, however, that WES informed him of the proposed settlement more than three years before it signed the consent decree, made repeated demands for indemnification and again notified him of its intent to enter into a settlement agreement on the eve of the final resolution.

---

**2.** *Parfait* actually appears not to be applicable to written contractual indemnity agreements like the one here. 484 F.2d at 304; *see also GAB Business Servs.*, 809 F.2d at 758 (indemnity based on agency relationship). This agreement,

for example, explicitly imposes on Siagel not only a complete indemnity obligation, but an unconditional duty to defend, which he clearly failed to perform. Nevertheless, I take the case as the parties present it.

These actions gave Siagel "an opportunity to review, pass upon, or participate in the settlement" that "afforded substantially the same protection" to Siagel as a formal demand to adopt the settlement or to defend WES. *GAB Business Servs.*, 809 F.2d at 760. Under the specific terms of his indemnity agreement, Siagel had the choice of either approving the proposal or taking over the defense and holding the indemnitee harmless. Compl.Ex.B. He chose to do neither, but instead denied all liability under the agreement or otherwise. Siagel Dep. Ex. 22. As a result, under *Parfait* and *GAB Business Servs.*—the controlling law according to both parties—WES must demonstrate only "potential" liability to the EPA to recover under the indemnity agreement.

■ I turn therefore to the question whether WES was a "volunteer" in agreeing to the EPA consent decree. The crux of Siagel's argument is that WES was not a potentially responsible party under CERCLA because it was not in existence at the time of any relevant hazardous waste operations. Def.'s Mem. in Supp. of Siagel's Mot. for Summ.J. at 12; Def.'s Opp'n Mem. at 14. Siagel maintains that CERCLA liability cannot not attach to a corporation that merely purchases the assets of another corporation that may have liability.

I have surveyed the caselaw on successor liability for corporate-asset purchasers as it existed at the time the Allwaste Group entered into the settlement agreement on July 31, 1991. I conclude that, as of that date, WES, as a purchaser of assets, met the standard of having "potential" liability.

■ The general trend in 1991 was toward an expansive view of CERCLA liability. *See, e.g., Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 91–92 (3rd Cir. 1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989). Whether an asset purchaser could be held liable under CERCLA was (and still is) unsettled in the First Circuit. CERCLA does not explicitly impose liability on successor corporations, but as of 1991, a number of courts had held that Congress had intended to impose such liability in the context of a merger in order to prevent polluters from shifting cleanup costs to taxpayers through corporate maneuvers. *E.g., id.; Anspec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1245 (6th Cir.1991); *GRM Industries, Inc. v. Wickes Mfg.*, 749 F.Supp. 810, 814–15 (W.D.Mich.1990). Other courts had announced that CERCLA liability would extend to purchasers of assets if one of the following four conditions were met:

> (1) The purchasing corporation expressly or impliedly agrees to assume the liability; (2) the transaction amounts to a "de-facto" consolidation or merger; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction was fraudulently entered into in order to escape liability.

*Louisiana–Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1263 (9th Cir.1990); *see also In re Acushnet River & New Bedford Harbor Proceedings*, 712 F.Supp. 1010, 1014 (D.Mass. 1989); *United States v. Distler*, 741 F.Supp. 637, 640 (W.D.Ky.1990), *on recons.*, 865 F.Supp. 398 (W.D.Ky.1991); *United States v. Bliss*, 20 Envtl.L.Rep. 20,879 (E.D.Mo.1988). The pertinent condition in this case is the third—whether WES was "merely a continuation" of National Industries. On this subject, the courts were divided at the time of the settlement agreement on July 31, 1991. Several courts adhered to the traditional view that the condition applied only if there was common identity of officers, directors and stockholders, *Kelley v. Thomas Solvent Co.*, 725 F.Supp. 1446, 1457–59 (W.D.Mich. 1988); *Sylvester Bros. Dev. Co. v. Burlington Northern R.R.*, 772 F.Supp. 443, 448–49 (D.Minn.1990), or "continuation of the corporate entity rather than the continuation of the business operation." *Distler*, 865 F.Supp. at 401. Neither of those requirements is met here. At least one other court, however, had concluded that the broad remedial policies of CERCLA demanded a more expansive interpretation. *United States v. Carolina Transformer Co.*, 739 F.Supp. 1030, 1039 (E.D.N.C.1989), *aff'd* (after the WES settlement agreement), 978 F.2d 832 (4th Cir.1992).[3] *Carolina Transformer* adopted

---

**3.** Another decision pointed in the same direction. *Distler*, 741 F.Supp. at 641. However, days be-

the more liberal "substantial continuity" or "continuity of enterprise" requirement developed by some courts, including the First Circuit, in other contexts. *Id.; see Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 43, 107 S.Ct. 2225, 2236, 96 L.Ed.2d 22 (1987); *Cyr v. B. Offen & Co.,* 501 F.2d 1145, 1153–54 (1st Cir.1974).

In assessing CERCLA liability under the "substantial continuity" exception for a purchase of assets, *Carolina Transformer* considered "[w]hether the business of both employers was the same, whether the employees of the new company were doing the same job, and whether the new company produced the same product for essentially the same customers." 739 F.Supp. at 1039. In our case, the purchase and sale agreement demonstrates that WES intended to retain National Industries employees, Compl.Ex.A at ¶ 13; retain the physical assets of National Industries, including equipment, fixtures and realty at the same location, ¶¶ 1, 3(B), 6.4; continue providing the same type of service, including assumption of at least one contract and the transfer of accounts receivable, ¶¶ 6.4, 12; and maintain continuity of business operations "as formerly conducted by seller," ¶¶ 4.6, 6.2(e), Recitals. The name, of course, was changed, and no evidence is presented on how the successor WES held itself out to the public in connection with National Industries.

Obviously, there was enough here over which to litigate CERCLA liability in the First Circuit in terms of both facts and divided caselaw had WES elected to do so, with the attendant risk that it would ultimately lose and be held subject to the entire joint and several liability for the Superfund site rather than the more limited pro rata amount it negotiated. But there was also certainly a sufficient number of factors to expose WES to at least "potential" liability, given the facts and the then current caselaw. As a result, its decision to settle with the EPA was not undertaken as a "volunteer," and Siagel is liable on his indemnity agreement.

fore the settlement agreement here (July 12 vs. July 31, 1991), the district judge reversed himself

## CONCLUSION

Since I have allowed Sawyer and his companies to ratify this lawsuit and have found that Siagel's only other defense to the enforceability of the indemnity agreement (the "volunteer" argument) cannot prevail, I conclude that Siagel does have liability to the plaintiff under the express terms of his indemnity agreement. I therefore DENY Siagel's summary judgment motion on Count I and GRANT the plaintiff's motion for partial summary judgment on liability on Count I. I therefore do not need to reach the parties' arguments concerning Count II involving the plaintiff's claim for contribution.

Following the lapse of time I have set out above for consideration of any discovery issues, the Clerk's Office shall schedule a conference of counsel to determine what further proceedings, if any, are needed on damages.

So ORDERED.

and took the more conservative approach under Ohio state law. 865 F.Supp. at 401.